BRIAN MATTIS *et al.*, Plaintiffs-Appellees, *v.* STATE FARM FIRE AND CASUALTY COMPANY, Defendant-Appellant.

Fifth District   No. 82—712

Opinion filed October 4, 1983.

Charles E. Schmidt, of Mitchell, Brandon & Schmidt, of Carbondale, and James B. Wham, of Wham & Wham, of Centralia, for appellant.

Brian Mattis and B. Taylor Mattis, both of Carbondale, for appellees, *pro se*.

JUSTICE KARNS delivered the opinion of the court:

Defendant, State Farm Fire and Casualty Company, appeals from the judgment of the circuit court of Jackson County in favor of plaintiffs and insured homeowners, Brian and B. Taylor Mattis. Plaintiffs cross-appeal from that part of the judgment denying their request for attorney fees. In a bifurcated trial, the court found defendant liable under an "all risk" homeowner's policy for structural damage to the Mattises' home. The court assessed damages in the amount of $33,086.69.

The Mattises purchased their home in 1974 and subsequently obtained a homeowner's insurance policy from State Farm with an inception date of May 20, 1974. The policy provided "all risk" homeowner's coverage for which an additional 5% premium was paid over State Farm's normal premium schedule for a named-perils homeowner's policy. This policy was renewed annually until the time when State Farm issued a second policy updating the original policy's coverage. The updated policy became effective May 20, 1979. The trial court found that "the insurance policy was in full force and effect at the time of the alleged physical loss, on or about May 15, 1979." The parties have raised an issue concerning which policy provisions control, based upon this finding by the trial court. The issue will be resolved following a greater detailed factual summary.

The Mattises' home is a conventional single-story frame structure. The home is built into the side of a hill with the front basement wall, facing north, below ground level and the back basement wall, facing south, above ground level. This arrangement is often termed a walk-out basement. The north and west basement walls are made of 12-inch concrete masonry blocks; the south and east basement walls are wood frame.

Brian Mattis testified that the Mattises were first informed of the physical damage claimed under the policy on May 15, 1979. According to Brian's testimony, a termite inspector had discovered some structural damage to the north basement wall during the course of a routine inspection. In July 1979, concerned about the structural integrity of the home, the Mattises contacted Carl Hartman, an architect from the firm of Fischer-Stein Associates, and employed him to inspect their home for structural damage.

Hartman testified that he had been employed to ascertain the damage to the structure and to determine a remedy for the damage. He found evidence of a horizontal crack in the north basement wall varying from a hairline to approximately one-quarter inch in gap running the entire visible length of the wall. Hartman also found inward displacement of the same vertical wall equal to approximately one-half to five-eighths inch with the point of greatest displacement being at about mid-height. Additionally, he found evidence of binding in the walls perpendicular to the north basement wall. Remedial measures suggested by Hartman included replacement or reinforcement of the cracked wall to prevent further damage or collapse.

Plaintiffs thereafter reported their home damage to State Farm's local agent. After inspecting the premises, the agent notified plaintiffs that State Farm would not cover the loss, citing numerous policy provisions. A series of correspondence between plaintiffs and State Farm followed. Meanwhile, finding the cost of replacement prohibitive, the Mattises opted to simply reinforce the existing north basement wall. The soil adjacent to the north wall was excavated and a similar wall adjacent to the existing wall was constructed and bolted to it. The soil was backfilled and landscaped to facilitate proper drainage and runoff.

Based upon reports as to causation submitted by State's Farm's structural engineer to State Farm, the insurer continued to deny plaintiffs' claim. Plaintiff testified that by this time the loss had become aggravated. The inward deflection of the north basement wall amounted to 3½ inches out of plumb to the south; mortar joints had opened; brick veneer had separated from the wall on the ground floor; the garage door was out of plumb; doors and windows at ground level were askew. Plaintiffs brought suit alleging 13 enumerated elements of damage to the structural integrity of the home and requesting compensation from State Farm under their all risk homeowner's policy.

The trial court found that at least one of the two policies mentioned at the outset was in full force and effect at times relevant. Under the broad coverage afforded by the policies issued by State Farm,

the court determined that unless the cause of the damage was specifically excluded or excepted by the terms of the policy, all risks of physical loss were within the coverage. Because the proof established that *one* cause of the loss was inadequate or improper design or construction of the dwelling at the particular site, and because that particular cause of loss was not excluded or excepted, the court applied the principle that if more than one cause creates a loss with one cause covered, but other causes not covered, the loss will be within the coverage of an all risk policy.

The trial court found, without specific elaboration, that "the insurance policy" was in full force and effect at the time of the alleged physical loss to the Mattis home on May 15, 1979. The two policies in question differ in several significant respects and these differences, in part, form the basis for State Farm's denial of coverage. State Farm has argued that only the amended policy, effective May 20, 1979, is applicable to the loss. We reject this contention. It was on May 15, 1979, that the Mattises were informed by the termite inspector of structural damage to the insured property. Although a claim was filed after the inception date of the amended policy, the Mattises were apprised of facts sufficient to warrant the filing of a claim against State Farm on May 15, 1979, or five days prior to the expiration of the original policy. It is this date which is controlling. The applicable policy is the one in effect at the time of discovery of the loss, the original policy.

This conclusion does not, however, dispose of the question as to which of the two policy provisions will be given effect. The evidence established that the original policy contained the following liberalization clause:

"*** If within 45 days prior to the inception of this policy, or during the term hereof, this Company adopts any revision of the form or endorsements made part of this policy which would broaden coverage presently granted hereunder without additional premium charge, such broadened coverage will automatically apply to this policy."

Thus, at the time the Mattises discovered their loss, the policy then in effect allowed them to take advantage of broadened coverage adopted by State Farm during its effective term. The original policy was revised and updated and a reissue certificate of this amended policy was prepared on March 30, 1979. The record shows premiums were paid on the amended policy on May 8, 1979. While it has been determined that the provisions of the original policy control, the liberalization clause, in effect, allows the insureds the benefit of those provisions of

the amended policy which broadened their coverage.

State Farm alleged numerous defenses based on policy exclusions and exceptions and presented proof to that effect. The policies included provisions that will be referred to as an earth movement clause; water pressure-water damage clauses; a settling, cracking and bulging clause; and a latent defect clause.

We agree with plaintiffs' contention that the "earth movement" exclusion in the policy that was in force on May 15, 1979, controls for the reasons stated above. That exclusion reads as follows:

"This policy does not insure against loss:

\* \* \*

2. caused by, resulting from, contributed to or aggravated by any earth movement, including but not limited to earthquake, volcanic eruption, landslide, mudflow, earth sinking, rising or shifting \*\*\*."

■ Both expert witnesses who testified agreed that settlement and consolidation of the backfill material placed against the north basement wall contributed to the loss. That it was not the sole cause is significant and will be addressed shortly. We are not persuaded, however, that this settlement and consolidation constitutes "earth movement" under the terms of the policy. As the supreme court of Wisconsin recognized in *Wisconsin Builders, Inc. v. General Insurance Co. of America* (1974), (65 Wis. 2d 91, 101-02, 221 N.W.2d 832, 837, "[t]he majority of the courts which have considered this particular exclusion have found it to be ambiguous and have applied the doctrine of *ejusdem generis* to limit the definition of 'earth movement' " to causes of the same class as earthquake and landslide. (See Annot., 44 A.L.R.3d 1316 (1972).) It is our view that the exclusions contained in this clause were not intended to cover damage resulting from something other than those causes of the type expressly stated in the exclusions. Moreover, other causes, defective design and construction, contributed to the damage resulting from the consolidation of soil placed against the north basement wall. (See *Wisconsin Builders, Inc. v. General Insurance Co. of America* (1974), 65 Wis. 2d 91, 221 N.W.2d 832; *Gullett v. St. Paul Fire & Marine Insurance Co.* (7th Cir. 1971), 446 F.2d 1100; *Wyatt v. Northwestern Mutual Insurance Co.* (D. Minn. 1969), 304 F. Supp. 781; *Government Employees Insurance Co. v. DeJames* (1970), 256 Md. 717, 261 A.2d 747.) We conclude that the earth movement clause does not provide a basis for denial of coverage.

■ The water damage and water pressure clauses contained in the policies are similar and can be addressed together. Both policies

exclude from coverage any loss resulting from water below the surface of the ground which exerts pressure on certain enumerated structures. The enumerated structures listed in each of the two policies differ, but no significance is attached to these differences. The record is entirely devoid of convincing proof that the Mattises' loss resulted from the presence of water. Hartman, an architect, called as an expert witness, stated on cross-examination that he was not hired by the Mattises to determine the cause of the damage but only to ascertain damage and determine remedial measures. Consequently, Hartman did not perform any tests to determine causation, nor did he take soil boring samples of the area to determine the presence of water. Although he described the nature and effect of hydrostatic pressure, his conclusion that hydrostatic pressure "could have contributed" to the inward displacement of the north basement wall was nothing more than speculation.

R. A. Nack, a structural engineer, was hired by State Farm to determine the cause of the home loss. In a report submitted to State Farm, Nack stated that "the cause of this wall failure is apparently due to backfill consolidation and lateral pressure created thereby." Although Nack alluded to water, water pressure and hydraulic pressure throughout his report, the report and his supporting testimony failed to establish that water caused the damage or that the loss resulted from the presence of water. Like Hartman, Nack also testified about hydrostatic pressure. When asked for his opinion as to whether there "might have or could have been hydrostatic pressure on the north wall of the basement that might have or could have contributed to the bulging," Nack responded affirmatively. But this, too, can be nothing more than speculation, for no tests were performed by Nack to detect the presence of moisture in the soil. Simply stated, the proof adduced failed to establish the applicability of the exclusion.

■ Another policy provision excepted from coverage loss "caused by *** settling, cracking, shrinking, bulging, or expansion of *** walls ***." Much has been said in argument attempting to draw a distinction between loss caused by bulging and cracking of walls and loss resulting from nonexcluded causes, either of which resulted in the substantial items of damage to the home. The Mattises argue that the cracked or bulged wall was not the cause of the loss, but resulted from the consolidation of the backfill against the defectively designed or constructed north wall. State Farm argues that the entire damage resulted from a chain reaction caused by the bulging of the basement wall. In this regard we would note that that policy is not a model of clarity in legal draftsmanship, as it seems to say that while damage

*caused* by a cracked or bulged wall is not an included loss, any *ensuing* loss is covered. The argument may be made that the wracking of the structure ensues from the cracked or bulged wall and damage resulting therefrom to the house is covered. The argument can also be made that the cracks or bulges were both a result of other causes and a cause itself.

We need not decide, however, whether the loss claimed is excepted from coverage by this provision. The trial court found that the proof established contributing causes and that one cause was inadequate or improper design or construction of the dwelling. The trial court found that by the terms of the policy in effect, State Farm agreed to insure the Mattises' home against *all* risks of physical loss *except* for loss caused by certain enumerated risks designated as exclusions or exceptions within the policy. Inadequate or improper design or construction was not specifically excepted or excluded. "Where a policy expressly insured against loss caused by one risk but excludes loss caused by another risk, coverage is extended to a loss caused by the insured risk even though the excluded risk is a contributory cause." (*Kraemer Bros., Inc. v. United States Fire Insurance Co.* (1979), 89 Wis. 2d 555, 570, 278 N.W.2d 857, 863-64. See also *Lawver v. Boling* (1976), 71 Wis. 2d 408, 238 N.E.2d 514; *Essex House v. St. Paul Fire & Marine Insurance Co.* (S.D. Ohio 1975), 404 F. Supp. 978; *General American Transportation Corp. v. Sun Insurance Office, Ltd.* (E.D. Tenn. 1965), 239 F. Supp. 844.) We agree with the trial court and conclude that a proximate and contributing cause of the loss to plaintiffs' dwelling was inadequate or improper design or construction of the dwelling at the particular site.

State Farm has not contested the finding below of contributing causes. Rather, it has argued that the inadequate or improper design or construction is a "latent defect" and therefore excepted by the latent defect clause of the policy. This portion of State Farm's third amended affirmative defense was stricken by the trial court and not tried.

The order simply strikes the affirmative defense "as a matter of law." The affirmative defense in question was pleaded as follows:

"7. Although specifically not admitting the nature and extent of the loss described in Plaintiffs' Complaint, Defendant affirmatively states that said loss was caused by one or more or all of the following:

\* \* \*

E. A latent defect in the home in that the north retaining wall was not properly designed and constructed to withstand the

pressure and weight of backfill on said wall; said condition not being apparent after the house was constructed and the backfill moved into place."

■ Defendant has cited a New York trial court decision in support of its contention that improper design or construction comes within a latent defect exclusion or exception (*80 Broad Street Co. v. United States Fire Insurance Co.* (N.Y. Sup. Ct. 1975), 88 Misc. 2d 706, 389 N.Y.S.2d 214). Both Hartman and Nack testified that they could not predict the failure of the north basement wall by visual inspection and routine examination. Nack did testify that he could have predicted failure of the wall if he had subjected it to scientific analysis. However, the great majority of the cases construing "latent defect" exclusions in policies of insurance limit the meaning of a latent defect to some inherent defect in the materials used in construction which could not be discovered by any known or customary test and do not include faulty design or construction within the meaning of this provision. (*Plaza Equities Corp. v. Aetna Casualty & Surety Co.* (S.D.N.Y. 1974), 372 F. Supp. 1325; *Essex House v. St. Paul Fire & Marine Insurance Co.* (S.D. Ohio 1975), 404 F. Supp. 978; *General American Transportation Corp. v. Sun Insurance Office, Ltd.* (E. D. Tenn. 1965), 239 F. Supp. 844, *aff'd per curiam* (6th Cir. 1966), 369 F.2d 906.) Here there was no defect in the materials used, but in the design or construction of the north wall to withstand the force exerted by the consolidation of the backfill placed against it.

Furthermore, the pleading failed to allege that the defect could not have been discovered by known scientific testing. The parties agree that a latent defect is one that is not apparent and cannot be discovered by reasonably careful inspection. The possibility of the wall failing could have been discovered by the insurer, according to its expert witness, had he been requested to subject it to proper scientific testing.

Section 43 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 43) requires that pleadings must plainly set forth facts constituting any affirmative defense. No facts were pleaded, only conclusions. Nowhere is it alleged in what manner the wall was defective. Nowhere is it alleged, for instance, that defective concrete blocks were used in construction, that defective mortar was placed between the blocks, or that any other "defect" contributed to the loss claimed. Absent the filing of an amendment, we cannot review what the court might have done had plain facts been subsequently pleaded. We are limited to a determination of whether there was error in striking the affirmative defense in the first instance. We are not persuaded that

the court erred in striking this defense. *Cf. Lowrey v. Malkowski* (1960), 20 Ill. 2d 280, 170 N.E.2d 147; *Lloyd v. Sears Bank & Trust Co.* (1978), 67 Ill. App. 3d 141, 384 N.E.2d 742.

The remaining question then is whether the inadequate or improper design or construction of the wall in conjunction with the consolidation of backfill material exerting pressure thereon is a "risk" insured against under the all risk homeowner's policy. Fundamentally, an all risk homeowner's policy provides coverage for losses not covered under traditional named perils policies. This is reflected in the additional premiums paid for such coverage. But the term "all risks" as used in policies of the type here in question is somewhat misleading. See 13A Couch on Insurance sec. 48:138, at 596 (2d ed. 1982).

■■ State Farm has cited and appended to its brief, Gorman, *All Risks of Loss v. All Loss: An Examination of Broad Form Insurance Coverages,* 34 Notre Dame Law. 346 (1958). This article contains a comprehensive overview of all risk policies to that date. The author concludes, and we agree, from many cases cited therein that for a loss to come within "all risks" the loss or damage must be fortuitous. The following language from *Compagnie des Bauxites de Guinee v. Insurance Company of North America* (W.D. Pa. 1983), 554 F. Supp. 1080, is instructive:

"As a matter of law, insurance coverage, even under an all risk policy of insurance, extends only to fortuitous losses, or losses caused by a fortuitous event. *Dow Chemical Co. v. Royal Indemnity Co.,* 635 F.2d 379 (5th Cir. 1981); *Atlantic Lines Limited v. American Insurance Co.,* 547 F.2d 11 (2d Cir. 1976). The determination of whether a loss is fortuitous is a legal question for the court to determine. *Redna Marine Corporation v. Poland,* 46 F.R.D. 81 (S.D.N.Y. 1969). This requirement of a 'fortuitous' event has been utilized by the courts as a fundamental principle of law in interpreting insurance contracts, and is not a new or novel concept. See G. Couch, Couch on Insurance 2d sec. 48:141 (1951)." 554 F. Supp. 1080, 1082.

Several leading cases have established the standards by which fortuity may be determined under all risk policies. In *Schloss Bros. v. Stevens* (1906), 2 K.B. 665, 674, the court found that "all accidental causes of damage" were included. Lord Sumner in *British Foreign Marine Insurance Co. v. Gaunt,* [1921] All E.R. 447, stated that certainties of occurrence were not contemplated by all risk coverage. "[The term 'all risk'] covers a risk, not a certainty; it is something which happens to the subject-matter from without, not the natural behaviour of that subject-matter, being what it is, in the circumstances

\*\*\*." ([1921] All E.R. 447, 455.) The supreme court of Mississippi has adopted the following language: " 'There must be some casualty, something which could not be foreseen as one of the necessary incidents of the adventure. The purpose of the police is to secure an indemnity against accidents which may happen, not against events which must happen.' " (*Gulf Transp. Co. v. Fireman's Fund Insurance Co.* (1920), 121 Miss. 655, 664, 83 So. 730, 733.) Most recently, the court in *Compagnie des Bauxites de Guinee v. Insurance Company of North America* (W.D. Pa. 1983), 554 F. Supp. 1080, had this to say:

> " 'Fortuitous' means happening by chance or accident, occurring unexpectedly or without known cause; accidental and undesigned. Black's Law Dictionary (Rev. 4th Ed. 1968). The damage or loss must therefore result from an extraneous cause, and not wholly from an inherent defect in the subject matter or from the inherent deficient qualities, nature, and properties of the subject matter insured. *Greene v. Cheetham* 293 F.2d 933 (2d Cir. 1961); *Mellon v. Federal Insurance Co.* 14 F.2d 997 (S.D.N.Y. 1926). (A. Hand, J.)" 554 F. Supp. 1080, 1083.

In *Compagnie des Bauxites de Guinee*, the insured brought suit to recover business interruption losses allegedly sustained as the result of structural failure and collapse of a tippler building and ore crusherhouse. The court found the structures were defectively designed and for that reason concluded that the structure was bound to collapse; hence, there was no fortuitous event. We do not think that this decision represents the better view regarding the fortuitous nature of loss occasioned by design defects. See, *e.g., Essex House v. St. Paul Fire & Marine Insurance Co.* (S.D. Ohio 1975), 404 F. Supp. 978.

In *Essex House* the court found that brick failure of the insured's apartment building was caused by a combination of poor workmanship, design defects and natural causes and that some of the causes were detectable and some were not. The court concluded that "[s]o far as the parties were concerned at the time the policy was issued, any loss to the building during the term of the policy would be dependent upon chance, and was a fortuitous event covered by the provisions of the 'All Risk' policy," 404 F. Supp. 978, 985.

We cannot say as a matter of law that the loss sustained by plaintiffs was inevitable or certain to occur because of an inherent deficiency in the home as built; other homes were built with concrete block foundations without foundation failure. The Restatement of

Contracts sec. 291, comment *a* (1932), defines a fortuitous event as:
"*** an event which so far as the parties to the contract *are aware*, is dependent on chance. It may be beyond the power of any human being to bring the event to pass; it may be within the control of third persons; it may even be a past event *** provided that the fact is unknown to the parties." (Emphasis added.)

Although State Farm's expert testified that plaintiffs' loss could have been predicted had he conducted tests and analysis, we do not think that hindsight provides an adequate basis to remove the loss from the ambit of fortuity as contemplated by the all risk policy. See *Essex House v. St. Paul Fire & Marine Insurance Co.* (S.D. Ohio 1975), 404 F. Supp. 978.

■ The evidence established that *a* proximate cause of the loss was settlement and consolidation of backfill material placed adjacent to the north basement wall some four years previous. We have concluded that *a* proximate cause of the loss was inadequate or improper design or construction of the dwelling at the particular site. The cause of the loss was a combination of natural and human failure. It is possible to conclude that but for this interaction and contribution of causes the event may never have occurred. But it is not possible to conclude that absent one cause the other cause would have by itself brought about the loss. It is this that makes the loss fortuitous and therefore an insurance risk. See *Vormelker v. Oleksinski* (1972), 40 Mich. App. 618, 199 N.W.2d 287.

■ Having found the existence of a nonexcluded or nonexcepted insurable risk, and in light of State Farm's agreement to insure all risks of physical loss except those excluded or excepted, we conclude that the plaintiffs have a compensable loss. We are satisfied that plaintiffs met their burden of proof of a loss within the perils insured against. (See *Rutgens Distributors, Inc. v. United States Fidelity & Guaranty Co.* (1981), 94 Ill. App. 3d 753, 419 N.E.2d 59; *Bliss Ring Co. v. Globe & Rutgers Fire Insurance Co.* (1955), 7 Ill. App. 2d 523, 129 N.E.2d 784.) The trial court's finding on the issue of liability is affirmed.

Plaintiffs have cross-appealed contending that the trial court erred in denying their motion for expenses and attorney fees under Supreme Court Rule 219(b) (87 Ill. 2d R. 219(b)).

On September 18, 1979, State Farm's structural expert submitted a report to State Farm concluding, among other things, that:
"The cause of this wall failure is apparently due to backfill consolidation and lateral pressure created thereby. These masonry

walls were not designed, nor constructed, to withstand these type [sic] of water and soil pressures."

By letter to plaintiffs dated September 19, 1979, State Farm denied coverage for the loss claimed, citing various policy provisions and the language quoted above from its expert's report.

On May 9, 1980, plaintiffs filed the following request to admit:

"5. That the masonry walls to the north and west of the dwelling structure were not designed nor constructed to withstand soil and water pressure from the exterior surface."

Defendant's reply to this request was filed on May 23, 1980, and stated:

"5. Defendant neither admits nor denies the allegations contained in paragraph five and cannot admit said allegations since Defendant does not have information and expertise to form a judgment as to the design and construction of the dwelling and its ability to withstand soil and water pressure from the exterior surface."

Subsequently, on March 19, 1981, State Farm pleaded the following affirmative defense.

"7. Although specifically not admitting the nature and extent of the loss described in Plaintiffs' Complaint, Defendant affirmatively states that said loss was caused by one or more or all of the following:

\* \* \*

E. A latent defect in the home in that the north retaining wall was not properly designed and constructed to withstand the pressure and weight of backfill on said wall; said condition not being apparent after the house was constructed and the backfill moved into place."

Plaintiffs argue that State Farm's neutral reply on May 23, 1980, has the same effect as a sworn denial under the Rule. They argue that this pleading, when coupled with its earlier denial of coverage on September 19, 1979, and defendant's affirmative defense pleaded on March 19, 1981, requires the mandatory invocation of Supreme Court Rule 219(b) since plaintiffs were able to prove at trial the truth of the matter of fact sought in their request to admit.

There is no question that plaintiffs did prove the content of the requested admission. Explicit in the rule, however, is the requirement that a party serve a sworn denial of the requested admission, thus forcing the requesting party to proof. Thus, Rule 219(b) requires not only that the matters asserted be proved, but also proof that the opposing party lacked good reasons to deny the request. (*Exchange Na-*

*tional Bank v. DeGraff* (1982), 110 Ill. App. 3d 145, 441 N.E.2d 1197.) A refusal to admit is not a denial and will not be treated as such where the replying party sets forth in detail the reasons why he cannot truthfully admit or deny the requested matters. (See 87 Ill. 2d R. 216(c)(1).) The request called for more than an admission of fact and required defendant to form an early opinion on the technical matter of the cause of the damage. State Farm's reply was made in terms of uncertainty; it was not a denial on its face. The refusal to admit was not unreasonable at that early stage of the discovery.

■ Even though it can be said that State Farm adopted that portion of its expert's September 18, 1979, report quoted in its September 19, 1979, letter to plaintiffs, we do not think that this is conclusive. State Farm listed thirty-some other policy exclusions or exceptions in that same letter. Discovery was in its earliest stage at this time and at the time of the filing of the request to admit. The expert's report used the word "apparently" in describing the condition which the plaintiffs sought to have State Farm admit at this early stage. Review of the record before us does not convince us that State Farm acted patently unreasonably in refusing to admit the truth of that which, at the time the admission was requested, it was unsure of the truth of. Further, State Farm cannot be required to have the foresight to anticipate the ultimate basis in law for the trial court's finding of liability. We affirm the trial court's denial of plaintiffs' motion for attorney fees and expenses.

For the foregoing reasons, the judgment of the circuit court of Jackson County is affirmed.

Affirmed.

HARRISON, P.J., and WELCH, J., concur.